UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| MARCUS RAY NELSON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 1:24-cv-00011-SNLJ |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM AND ORDER

On January 26, 2024, Petitioner Marcus Nelson ("Nelson") filed this Motion to Vacate, Set Aside or Correct Sentence pursuant to Title 28, United States Code, Section 2255 [Doc. 1]. This Court then ordered the United States to show cause why the relief requested in Nelson's motion should not be granted. The government filed a response on March 14, 2024 [Doc. 3]. Nelson did not file a reply. Based on the reasons set forth below, this Court will dismiss Nelson's claims as waived and procedurally barred or otherwise deny them without an evidentiary hearing because they fail as a matter of law.

### I. PROCEDURAL HISTORY

Petitioner Marcus Nelson and co-defendant Gino Wells were indicted by a federal grand jury on one count of Conspiracy to Distribute 500 Grams or More of Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and one count of Aiding and Abetting Possession with Intent to Distribute 500 Grams or More of Methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. *United States*

*v. Marcus Ray Nelson*, 1:19-cr-00145-SNLJ ("Crim. Case"), Docs. 1, 2.[1]  Wells entered a plea of guilty pursuant to a cooperation agreement with the government and agreed to testify against Nelson, who elected to proceed to trial by jury.  The government called ten witnesses and introduced forty-seven exhibits during the two-day trial.  Crim. Case, Docs. 191, 192 (transcript of the jury trial, or "Tr.").

At the trial, Deputy Taylor Tinsley with the Dunklin County Sheriff's Office testified about an event occurring on December 10, 2018, where Nelson was driving a sport utility vehicle ("SUV") that was stopped for a traffic violation; Nelson and his front seat passenger jumped out of the vehicle and fled on foot.  Tr. at 120-21.  After a brief pursuit, both men were apprehended and taken into custody.  *Id*.  A subsequent search of the SUV revealed a bag containing a half pound of methamphetamine and a firearm.  Tr. at 122-35; Govt. Ex. 1 and 3.  The jury also heard jail calls related to this event where Nelson attempted to have others "take" the charges for him.  Tr. at 169-186; Govt. Ex. 9.

Detective Corey Mitchell with the Poplar Bluff Police Department and Task Force Officer ("TFO") for the Drug Enforcement Administration ("DEA") testified that he received information from a confidential source ("CS") that a large shipment of methamphetamine would be delivered to the residence of Gino Wells in Doniphan, Missouri, on March 19, 2019.  Tr. at 213.  Mitchell and other law enforcement officers responded to Wells's residence to conduct a "knock and talk" to attempt to follow-up on the CS's information.

---

[1] Nelson was also charged with a third count of Possession with Intent to Distribute Heroin.  The jury acquitted him of that charge.

2

Officers arrived at the residence, knocked on the front door, and were greeted by Nelson's girlfriend, Tambra Williams.  Tr. at 216.  Williams confirmed that Wells was inside.  Wells then exited the residence and began speaking with officers in the driveway.  *Id*.  While officers were speaking with Wells, they heard a loud noise, "sounded like a thud . . . basically something that fell and hit the ground," coming from the side of the residence.  Tr. at 234.  TFO Jason Morgan testified that he immediately responded to the sound and discovered a black duffel bag lying on the ground.  *Id*.  TFO Morgan picked up the bag and brought it to where Wells and the officers were speaking.  *Id*.  Officers asked Wells if he knew what was in the bag, and he responded that it contained eleven pounds of "ice," a street term for crystal methamphetamine.  *Id*.  Wells further stated that the bag was "light" and was supposed to contain fifteen pounds, of which Wells was supposed to receive three pounds for distribution.  *Id*.

Shortly after the bag was discovered, several subjects exited the residence, including Marcus Nelson, Wells's son (age 16), and Johnathan Morris.  Tr. at 221, 280.  Nelson denied having any connection to the duffel bag.  Morris informed officers that he was a music producer who accompanied Nelson to the residence to film a rap video.  Tr. at 255, 280.  Wells and Nelson were both arrested.  Officers seized an AT&T flip phone from Wells's person.  Tr. at 218-20; Govt. Ex. 15.  Officers later obtained a search warrant for the black duffel bag and discovered four large packages of methamphetamine, totaling 5.28 kilograms and 333.57 grams of heroin.  Tr. at 223-25; Govt. Exs. 11, 12, 17, and 38.

Nelson's residence was searched the following day.  Tr. at 234.  Tambra Williams

3

was present during the execution of the warrant.  Tr. at 300-01.  Officers seized various items used in narcotics distribution.  Tr. at 243-45.  Officers located a firearm in a bedroom safe but chose not to seize it after Ms. Williams claimed ownership.  Tr. at 300-01.

Gino Wells testified against Nelson at the trial.  Wells acknowledged that his cooperation agreement would include an unknown reduction in his sentence.  Tr. at 319.  Wells provided extensive testimony about his relationship with Nelson, including how they met years prior and began their drug-trafficking activities.  Tr. at 333-35.

Regarding the December 2018 arrest, Wells testified that he met up with Nelson the night prior at a strip club and Nelson advised Wells he was needing a half-slab (referring to a half-pound of methamphetamine) to sell to someone down south.  Tr. at 345-46.  Wells agreed to "front" Nelson the half pound.  *Id*.  The next day, Tambra Williams told Wells about the traffic stop in Dunklin County where Nelson was arrested.  Tr. at 348.  Ms. Williams arranged a three-way call where Nelson assured Wells that he would pay him back for the half pound of methamphetamine that was seized by police.  Tr. at 348-49.

Wells testified that Nelson was released from jail several days later and Nelson began providing Wells with methamphetamine to distribute.  Tr. at 355.  Wells further testified that Nelson had Mexican sources of supply in Texas that he referred to as the "amigos."  Tr. at 356.  Wells said Nelson provided him with an AT&T flip-phone to use for their drug-trafficking activities.  Tr. at 360-61.  Later in the trial, Wells scrolled through messages on the flip-phone and testified that a message from Nelson that stated:

4

"He's sending 30," referred to a thirty-pound shipment of methamphetamine that Nelson was expecting from his suppliers in Texas.  Tr. at 362, 366-67.

Wells testified that a week prior to the arrest on March 19, 2019, Nelson was meeting with his Texas suppliers and Wells witnessed Nelson remove $30,000 from a safe in Nelson's bedroom that he placed in a grocery bag to pay his suppliers.  Tr. at 379. Wells further testified that Nelson expected to receive fifteen pounds of methamphetamine in return.  *Id.*

Wells testified that he and Nelson were together earlier in the day on March 19, 2019, when Nelson picked up the duffel bag from another individual.  Tr. at 383.  Wells said he was initially supposed to get five of the fifteen pounds of methamphetamine but since it was only eleven pounds, Nelson was going to him three, with the understanding that Wells would pay him $3,800 per pound once it was sold.  Tr. at 384, 389.

According to Wells, they ended up at his house that night because Nelson previously made plans to shoot a rap video there.  Tr. at 382, 389.  Nelson brought the duffel bag with him to feature the methamphetamine in the video.  Tr. at 387.  Wells recounted the events from the moment police arrived, including his efforts to cooperate immediately following his arrest.  Tr. at 391.  Finally, Wells testified that he received approximately ten pounds of methamphetamine from Nelson between January and March 2019.  Tr. at 392.

Wells's son (age 16) testified that he was at the house the night his father and Nelson were arrested.  He testified that after his father went outside to speak to officers, Nelson began "running around looking for a black duffel bag."  Tr. at 436.  Wells's son

5

further testified that he personally witnessed Nelson grab the bag and throw it out of a window facing the woods, before stating, "Whoop, there's your dad some more charges." *Id*.

In addition to calling ten witnesses and introducing forty-seven exhibits, the government introduced a prior drug sale conviction from 2007 as 404(b) evidence.  Tr. at 164-67; Govt. Ex. 21.  The government rested its case.  The defense announced that it would not be presenting any evidence and moved for judgement of acquittal at the close of the government's case and at the close of all evidence, alleging insufficient evidence. Tr. at 465-66.

Nelson's closing argument focused largely on attacking Wells's credibility, referring to him as a "bought and paid for" "professional snitch" who could not be believed.  Tr. at 502-11.  Nelson argued the text message, "He's sending 30," does not say anything nor corroborate anything.  Tr. at 502.  Nelson speculated that Wells's son was responsible for throwing the duffel bag out of the window.  Tr. at 506-07.  As to the December 10, 2018, arrest, Nelson suggested the traffic stop was pretextual and questioned whether a traffic violation was even committed.  Tr. at 510.

The jury began their deliberations at 5:06 p.m. and returned a verdict of guilty at 8:17 p.m.  Tr. at 521; Crim. Case, Doc. 137.  The Court accepted the verdicts and ordered the United States Probation Office to prepare a presentence investigation report ("PSR").

The PSR calculated Nelson's sentencing guideline range at 360 months to life, noting he was a Career Offender, but also noting that he had 16 criminal history points that would make him a criminal history category VI regardless.  Crim. Case, Docs. 158,

6

178 ¶¶ 98, 57, 58.  The PSR included Nelson's criminal history, including his five felony convictions for controlled substance offenses.  PSR ¶¶ 37, 42, 46, 48, 55.

Nelson objected to the PSR, noting that he was maintaining his innocence.  Doc. 177.  At sentencing, Nelson requested a downward variance and asked the Court to impose a sentence of 218 months.  Doc. 179.  Nelson did not file a motion for new trial.  The government requested a sentence of 360 months, bottom of the sentencing guideline range, as sufficient but not greater than necessary to satisfy the statutory purposes of sentencing.  Doc. 193 ("Sent. Tr.") at 8-10.

This Court denied Nelson's objection of innocence, stating: "The Court presided over the trial, and the Court agrees with the verdict rendered by the jury in the case.  And the Court listened very intently, of course, to the evidence presented, and all those facts were supported by the evidence.  And the Court would have found just as the jury found that evidence was established beyond a reasonable doubt."  Sent. Tr. at 3-4.  The Court imposed a sentence of 300 months imprisonment to be followed by a 5-year period of supervised release.  Sent. Tr. at 16.

Nelson appealed his convictions on September 29, 2021, raising two points on appeal.  Doc. 187.  Nelson challenged the sufficiency of the government's evidence, claiming Wells was not a credible witness, and Nelson further argued that the text message, "He's sending 30," constituted a *Brady* violation.[2]  The Eighth Circuit affirmed

---

[2] Nelson's challenge to the text message was not actually *Brady* material because the evidence was incriminating; rather, the challenge should have been addressed as a Rule 16 violation.  *United States v. Nelson*, 51 F.4th 813, 818 n.4 (8th Cir. 2022).  Either way, the Eighth Circuit determined there was not substantial prejudice to Nelson.  *Id*. at 819.

7

the convictions, holding the evidence was sufficient, and Nelson was not substantially prejudiced by the introduction of the single text message. *United States v. Nelson*, 51 F.4th 813 (8th Cir. 2022).

Nelson has now filed this Motion under Rule 28 U.S.C. § 2255, asking this Court to set aside his convictions and sentence.  Doc. 1.  Nelson alleges several grounds or errors in his ineffective assistance of counsel claim to include the following:

1. Counsel was ineffective for failing to pursue an alibi defense;

2. Violations to his First, Fourth, Fifth, Sixth, and Eighth Amendment rights;

3. Counsel was ineffective for failing to file a motion to suppress, to include:

   a. Failing to interview witnesses,

   b. Failing to challenge the search and seizure as illegal,

   c. Failing to challenge the witnesses' credibility, and

   d. Failing to suppress evidence that violated *Brady*;

4. Counsel was ineffective for failing to object to both the sentence imposed and a firearm enhancement.

Because Nelson's claims fail as a matter of law, the Court will dismiss the motion without a hearing.

## II.  LEGAL STANDARD

"Section 2255 was intended to afford federal prisoners a remedy identical in scope to Federal habeas corpus." *Sun Bear v. United States*, 644 F.3d 700, 704 (8th Cir. 2011) (en banc) (quotation omitted).  And like habeas corpus, this statutory remedy "does not encompass all claimed errors in conviction and sentencing." *Id*. (quoting *United States v.*

8

*Addonizio*, 442 U.S. 178, 185 (1979)).  Under section 2255(a), a petitioner may file a motion for post-conviction review on four specified grounds: "(1) 'that the sentence was imposed in violation of the Constitution or laws of the United States,' (2) 'that the court was without jurisdiction to impose such a sentence,' (3) 'that the sentence was in excess of the maximum authorized by law,' and (4) 'that the sentence is otherwise subject to collateral attack.'"  *Martin v. United States*, 150 F.Supp. 3d 1047, 1049 (W.D. Mo. 2015) (quoting *Hill v. United States*, 368 U.S. 424, 426-27 (1962)).  The petitioner bears the burden of proof as to each asserted ground for relief.  *Golinveaux v. United States*, 915 F.3d 564, 567 (8th Cir. 2019) (citation omitted).

## A.  Claims Alleging Ineffective Assistance of Counsel

To prevail on a claim of ineffective assistance of counsel, a petitioner has the burden of proving his or her claims by a preponderance of the evidence.  The United States Supreme Court set forth the standard to apply in *Strickland v. Washington*, 466 U.S. 668 (1984).  First, a petitioner must prove that counsel's performance was so deficient that counsel was not functioning as the counsel guaranteed by the Sixth Amendment.  *Id*. at 687.  As to the "deficiency" prong, the petitioner must show that counsel "failed to exercise the customary skills and diligence that a reasonably competent attorney would [have] exhibit[ed] under similar circumstances."  *Cheek v. United States*, 858 F.2d 1330, 1336 (8th Cir. 1988); (quoting *Hayes v. Lockhart*, 766 F.2d 1247, 1251 (8th Cir. 1985)).  Second, petitioner must show that petitioner was prejudiced by counsel's errors, and but for counsel's errors the result of the proceeding would have been different.  *Strickland*, 466 U.S. at 687.  Where a reviewing court determines that the

9

challenged errors had no impact on the result of the proceedings, the ineffectiveness claim fails. *Fields v. United States*, 201 F.3d 1025, 1027 (8th Cir. 2000). Where petitioner cannot affirmatively prove prejudice, the performance prong need not be addressed. *Boysiewick v. Schiro*, 179 F.3d 616, 620 (8th Cir. 1999) (citing *Pryor v. Norris*, 103 F.3d 710 (8th Cir. 1997)).

## B.  Need for Evidentiary Hearing

A motion filed under 28 U.S.C. § 2255 should be denied without an evidentiary hearing when the court records conclusively show that the petitioner is not entitled to relief.  A hearing is not required "where the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based." *Anjulo-Lopez v. United States*, 541 F.3d 814, 817 (2008) (quoting *Watson v. United States*, 493 F.3d 960, 963 (8th Cir. 2007)).  The Eighth Circuit has repeatedly recognized, "[a] § 2255 motion can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Tinajero-Ortiz v. United States*, 635 F.3d 1100, 1105 (8th Cir. 2011) (quoting *Sanders v. United States*, 341 F.3d 720, 722 (8th Cir. 2003)).  Conclusory allegations will simply not suffice. *United States v. Robinson*, 64 F.3d 403, 405 (8th Cir. 1995).

## III.  DISCUSSION

## A.  Counsel was not ineffective for failing to present an alibi defense.

Nelson's first ground for relief asserts that trial counsel was ineffective for various

10

failings in pursuing an alibi defense, to include: failure to conduct a meaningful investigation to discover an alibi defense; failure to present an alibi defense at trial; failure to find independent, objective sources to support his testimony; failure to present evidence of his innocence, including evidence that undermines the government's case; and failure to reasonably investigate before settling on a trial strategy.  Nelson's ineffectiveness claim fails because it is without adequate factual support.

It is a petitioner's burden to set forth adequate facts to establish that he is entitled to relief, and failure to do so is fatal.  *See, e.g., LeCroy v. United States*, 739 F.3d 1297, 1321 (11th Cir. 2014) ("the burden of proof . . . on a § 2255 petition belongs to the petitioner"); *Kress v. United States*, 411 F.2d 16, 20 (8th Cir. 1969) ("In a § 2255 proceeding, the burden of proof with regard to each ground for relief rests upon the petitioner[.]").  Petitioner's claims must go beyond mere allegations and must not be so incredulous as be unbelievable.  "The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."  *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). Here, Nelson fails to explain what his alibi defense was, what witnesses or evidence would support that defense, and what investigation counsel failed to do to proffer alibi as a viable defense.

Nelson seemingly suggests that counsel was ineffective for failing to find an alibi defense for him, "[c]ounsel, Jason Korner, failed to conduct a meaningful investigation by which he would have *discovered* an alibi defense."  Doc. 1 (emphasis added).  Nelson claims that counsel, "failed to do a pretrial investigation into the availability of

11

independent, objective sources to support the part of his client's testimony that he knows or can reasonably expect will be challenged, and subsequently to present to the jury any evidence he finds that tends to show his client's innocence and tends to undermine the prosecution's case." *Id*.

Nelson's claim is difficult to decipher. Nelson truthfully did not have a viable alibi defense for the events occurring on March 19, 2019, where he was present and arrested at the scene of the crime. Every witness that testified provided an eyewitness accounting of that fact, from law enforcement officers to Gino Wells and his son, to Tambra Williams, Nelson's girlfriend, who was with Nelson at Wells's residence that evening. Nelson's claim that further investigation by counsel would have turned up this alibi defense is clearly refuted by the record. Counsel was not ineffective for failing to investigate a falsehood.

Unless a petitioner specifically explains what, in his view, counsel failed to investigate, he cannot show that counsel was ineffective for failing to conduct that investigation. *See United States v. Robson*, 307 F. App'x. 907, 911 (6th Cir. 2009) (declining to review ineffectiveness claim because the record did not show what information could have been further investigated or how it might have altered the outcome of the case). "Counsel's failure to investigate . . . may constitute ineffective assistance, . . . particularly when an attorney fails to investigate a plausible alibi defense . . . . [but absent] some objectively credible evidence to support an alibi defense, we cannot fault [counsel] for choosing not to pursue [it]," especially where the petitioner provided no information that would have suggested such an investigation. *Cope v.*

12

*United States*, 385 F. App'x. 531, 533-34 (6th Cir. 2010) (citation omitted); *see also Rompilla v. Beard*, 545 U.S. 374, 383 (2005) ("[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up . . . ."). It is not enough for Nelson to argue his counsel was ineffective for failing to investigate and pursue an alibi defense without tendering what that alibi defense was, identifying the witnesses who would have supported the alibi defense or identifying what that investigation might uncover.

Additionally, Nelson was convicted in Count I of Conspiracy to Distribute Methamphetamine: "[b]eginning at a time unknown to the Grand Jury but including on or about March 19, 2019 . . ." for which there is no alibi defense. Doc. 2. *See United States v. Agofsky*, 20 F.3d 866, 871 (8th Cir. 1994) ("[s]ince a conspirator may be held liable for acts of his co-conspirators, he may not assert an alibi defense); *see also United Staes v. Anderson*, 654 F.2d 1264, 1270-71 (8th Cir. 1981), *cert denied*, 454 U.S. 1127, 102 S.Ct. 978, 71 L.Ed.2d 115 (1981), and *cert. denied*, 454 U.S. 1156, 102 S.Ct. 1030, 71 L.Ed.2d 314 (1982) (alibi defense not supported by law in drug conspiracy case where it was unnecessary for government to prove defendant's presence at the drug sales).

Turning now to Count II, this count does pertain to events occurring on a particular day, March 19, 2019, for knowingly possessing with intent to distribute five hundred grams or more of methamphetamine, to which an alibi defense might legally apply. However, the overwhelming evidence against Nelson closes the door on arguing he was anywhere but Wells's residence on March 19, 2019, where the duffel bag of methamphetamine was discovered. Wells was outside speaking with law enforcement

13

officers when the duffel bag was thrown from the window.  The officers retrieved the bag as soon as they heard it hit the ground.  Tr. at 217.  The bag was brought to Wells who confirmed that it belonged to Nelson and contained eleven pounds of ice, of which he was supposed to receive three.  *Id*.  Shortly after the bag hit the ground, Nelson exited Wells's residence and was taken into custody along with Wells.  Tr. at 255, 280.

The jury heard testimony from Wells's son that Nelson threw the bag and made the comment, "Whoop, there's your dad some more charges."  Tr. at 436.  The Eighth Circuit determined "Gino Wells provided ample testimony regarding Nelson's drug related activities."  *Nelson*, 51 F.4th at 818.  Aside from Nelson and Wells, there was no evidence to support that any other person at the residence was involved in narcotics trafficking.  There was no question that Nelson was present at the time and place the police said he was present, along with the duffel bag containing methamphetamine.  Nelson's assertions that counsel failed to pursue an alibi defense and find sources to support it are meritless.  "An attorney is not required to present a baseless defense or to create one that does not exist."  *Krist v. Foltz*, 804 F.2d 944, 946 (6th Cir. 1986); *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001) ("by definition, . . . counsel cannot be ineffective for failure to raise an issue that lacks merit").

Nelson also criticizes counsel's failure to "present to the jury any evidence he finds that tends to show his client's innocence."  Whether this is a claim of actual innocence is not clear.  What is clear is that Nelson fails to present any new evidence in support of his innocence.  For a claim of actual innocence to prevail, petitioner must present new and reliable evidence that was not presented at trial and show that this new

14

evidence would change the outcome of the trial. *Bannister v. Delo*, 100 F.3d 610, 615 (8th Cir. 1996); *see also Schlup v. Delo*, 513 U.S. 298, 327-28 (1995) (after presenting new evidence, the movant must establish that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence"). Here, Nelson presents no new evidence, rendering his suggestion of innocence simply not credible.

Nelson's claim of ineffective assistance of counsel for failing to pursue alibi fails as meritless. Nelson is entitled to no relief for ground one of his § 2255 motion.

**B. Nelson's claim that his conviction and sentence violated his First, Fourth, Fifth, Sixth, and Eighth Amendment rights is insufficiently pled and procedurally defaulted.**

Nelson's second ground for relief is a blanket statement that his constitutional rights under the First, Fourth, Fifth, Sixth, and Eighth Amendments were violated. Nelson fails to explain how. Nelson states the following: "Mr. Nelson's conviction and sentence are violative of his right to freedom of speech and to petition, his right to be free of unreasonable search and seizure, his right to due process of law, his right to counsel, to confrontation of witness, to present a defense, and to compulsory process, and his right to be free of cruel and unusual punishment under the constitution." Doc. 1. Nelson states conclusions unsupported by a single fact. Nelson fails to explain how his rights were violated nor offer any guidance for how these constitutional provisions impacted his conviction and sentence. Nelson's second ground for relief is inadequate on its face. "[A] habeas petitioner must do more than proffer gauzy generalities or drop self-serving hints that a constitutional violation lurks in the wings." *David v. United States*, 134 F.3d 470, 478 (1st Cir. 1998); *see also Wogenstahl v. Mitchell*, 668 F.3d 307, 335 (6th Cir.

15

2012); *Short v. United States*, 504 F.2d 63, 65 (6th Cir. 1974) (holding that if "claims are stated in the forms of conclusions without allegations of fact in support thereof," a § 2255 motion is "legally insufficient"); *O'Malley v. United States*, 285 F.2d 733, 735 (6th Cir. 1961) ("Conclusions, not substantiated by allegations of fact with some probability of verity, are not sufficient to warrant a hearing.").

Additionally, Nelson's claim that his constitutional rights were violated is procedurally defaulted.  Any claim that could have been raised on direct appeal, but was not, is deemed procedurally defaulted.  *Bousley v. United States*, 523 U.S. 614, 621 (1998) ("[E]ven the voluntariness and intelligence of a guilty plea can be attacked on collateral review only if first challenged on direct review.").  Failure to raise a claim on direct appeal is overcome only by showing good cause and actual prejudice or actual innocence.  *Id*. at 622; *United States v. Frady*, 456 U.S. 152, 167-68 (1982).  The hurdle is "intentionally high . . . , for respect for the finality of judgments demands that collateral attack generally not be allowed to do service for an appeal."  *Elzy v. United States*, 205 F.3d 882, 884 (6th Cir. 2000).  Ordinarily, an external impediment preventing petitioner from having raised the claim earlier is required.  *Murray v. Carrier*, 477 U.S. 478, 492 (1986).  Until cause is shown, prejudice need not be addressed.  *Bousley*, 523 U.S. at 623.

Nelson raised none of the constitutional challenges in his direct appeal, and no cause exists for this Court's consideration now.  Nelson's claim fails as insufficiently pled and procedurally defaulted.  Nelson is entitled to no relief for ground two of his § 2255 motion.

**C.  Counsel was not ineffective for failing to suppress illegally obtained evidence.**

Nelson's third ground for relief is difficult to decipher and packs several unrelated issues into a single ineffectiveness claim, including: (1) failure to interview corroborating witnesses; (2) failure to seek suppression of illegally obtained evidence; (3) failure to attack government witness credibility; and (4) failure to suppress evidence in violation of *Brady*.  Unfortunately, there is no indication as to what witnesses counsel failed to interview, what evidence was illegally obtained, what witnesses' credibility counsel failed to attack, or what evidence counsel failed to suppress in violation of *Brady*.  Nelson's failure to meet his burden of proof for these claims make this ground for relief particularly difficult to address.

Claims of ineffective assistance of counsel require petitioner to identify specific acts or omissions which reveal that counsel did not provide "reasonably effective assistance," *Strickland*, 466 U.S. at 687, as measured by "prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005).  Counsel is strongly presumed to have provided effective assistance, and the petitioner has the burden to show otherwise. *Strickland*, 466 U.S. at 689.  "Counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise would have won . . . [T]he threshold issue is not whether [counsel] was inadequate; rather, it is whether he was so *manifestly* ineffective that defeat was snatched from the hands of probable victory."  *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (en banc) (emphasis in original; internal citation omitted).

17

### 1. *Failure to call witnesses*

Nelson's claim Nelson's claim that counsel failed to interview corroborating witnesses, without more, is fatally insufficient.  *See, e.g., LeCroy v. United States*, 739 F.3d 1297, 1321 (11th Cir. 2014) ("the burden of proof . . . on a § 2255 petition belongs to the petitioner" who must set forth adequate facts to establish he is entitled to relief, and failure to do so is fatal).  First, Nelson fails to disclose what witnesses he is referring to.  Second, Nelson fails to disclose what those witnesses would corroborate.  Without providing any explanation as to who those witnesses are or what those witnesses might say makes them nothing more than imaginary and renders this claim meritless.  Additionally, decisions about what witnesses to call are quintessentially matters of trial strategy, requiring a petitioner to overcome a strong presumption that counsel's decision not to call a particular witness was strategic and reasonable.  *Bentley v. Motley*, 248 F. App'x. 713, 718 (6th Cir. 2007) (review of such choices is "highly deferential").  The Eighth Circuit has held, "a reasoned decision not to call a witness is a virtually unchallengeable decision of trial strategy, in part because there is a considerable risk inherent in calling any witness because if the witness does not hold up well on cross-examination, the jurors might draw unfavorable inferences." *Rodela-Aguilar v. United States*, 596 F.3d 457, 464 (8th Cir. 2010) (internal quotations omitted).

Additionally, failure to provide the identity and affidavits of the expected testimony of alleged exculpatory witnesses are fatal to claims of ineffectiveness. *Armstrong v. Kemna*, 534 F.3d 857, 867-68 (8th Cir. 2008) (quoting *Harris v. Quarterman*, 496 F.3d 419, 428 (5th Cir. 20078) ("[o]rdinarily, a defendant's failure to

18

present some evidence from the uncalled witness regarding that witness's potential testimony . . . would be fatal to an ineffective assistance of counsel claim") (citations omitted)).  Nelson's failure to disclose what witnesses counsel failed to interview and failure to disclose what those witnesses might testify to, makes this claim impossible to address.  The Court is left to presume this was a matter of trial strategy.  Nelson fails to overcome the strong presumption that this decision was not both strategic and reasonable.  Purported testimony that is merely of hypothetical or remote benefit to the defense is insufficient to prove prejudice.  *Caban v. United States*, 281 F.3d 778, 786 (8th Cir. 2002).

### 2.  Failure to file a motion to suppress

There was no motion to suppress in this case, and Nelson does not disclose what evidence he deemed suppression worthy. "[F]ailure to bring a meritless suppression motion cannot constitute ineffective assistance." *Brown v. McKee*, 231 Fed.Appx. 469, 475 (6th Cir. 2007) (quoting *United States v. Tisdale*, 195 F.3d 70, 73-74 (2d. Cir. 1999)); *see also United States v. Johnson*, 707 F.2d 317, 320 (8th Cir. 1983).

Nelson claims ineffectiveness for failure to suppress "physical evidence" but does not say what physical evidence counsel failed to suppress, leaving either the narcotics found in the duffel bag on March 19, 2019, or the firearm and drug paraphernalia found at his residence the following day.

The duffel bag that was thrown from the window of the residence was abandoned property that Nelson no longer had a reasonable expectation of privacy in.  *United States v. Crumble*, 878 F.3d 656, 659 (8th Cir. 2018) (defendant does not have a reasonable

19

expectation of privacy in abandoned property). "A warrantless search of abandoned property does not implicate the Fourth Amendment, for any expectation of privacy in the item searched is forfeited upon its abandonment." *United States v. Tugwell*, 125 F.3d 600, 602 (8th Cir. 1997) (citations omitted); *see also United States v. Nowak*, 825 F.3d 946, 948 (8th Cir. 2016) (quotations and alterations omitted).

There is nothing unlawful in the government appropriating and seizing abandoned property. *Abel v. United States*, 362 U.S. 217, 241 (1960); *see also California v. Hodari*, 499 U.S. 621, 629 (1991) (cocaine abandoned by subject running away from police after a lawful order to stop was not fruit of the seizure once the officer was able to tackle subject, making denial of subject's motion to exclude the evidence proper); *United States v. Warren*, 221 F.3d 1345 (8th Cir. 2000) (defendant objectively relinquished any reasonable expectation of privacy in duffle bag after hanging it on a stranger's fence and walking away); *United States v. Willis*, 967 F.2d 1220, 1223 (8th Cir. 1992) (defendant abandoned shopping bag by dropping it in parking lot with police in pursuit).

Nelson relinquished any reasonable expectation of privacy in the duffel bag by throwing it out the window. Officers were well within their right to open the bag and search its contents the moment it was abandoned at Wells's residence, a property over which Nelson had no Fourth Amendment standing.[3]

However, the officers did not do so. Rather, they went the extra step of obtaining

---

[3] Nelson at least abandoned the bag, but the trial testimony suggests he was actually inviting a police search of the bag. Wells's son testified that when Nelson threw the bag out the window, he said, "Whoop, there's your dad some more charges." Tr. at 436. The record supports the inference that he threw the bag out the window with the goal that police would search the bag, find the controlled substances, and arrest Wells.

a valid search warrant based on probable cause before ever opening the duffle bag and examining its contents.  "A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 234 (2013) (internal quotations and citations omitted).  Probable cause is all the Fourth Amendment requires, and "[t]he test for probable cause is not reducible to 'precise definition or quantification.'"  *Id*. at 243 (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).  Rather, it is a practical, common-sense standard that "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 243-44)).

Probable cause for the search warrant of the duffel bag was abundant. Officers initially responded to Wells's residence based on information from a CS that a large shipment of methamphetamine would be delivered to the residence in Doniphan, Missouri, on that particular day, March 19, 2019.  Tr. at 213.  After officers heard the "thud" of the bag hitting the ground, TFO Jason Morgan testified that he immediately responded to the sound and discovered a black duffel bag lying on the ground.  Tr. at 234. TFO Morgan picked up the bag and brought it to where Wells and the officers were speaking.  *Id*.  Officers asked Wells if he knew what was in the bag, and he responded that it contained eleven pounds of "ice," a street term for crystal methamphetamine.  *Id*. Wells further stated that the bag was "light" and was supposed to contain fifteen pounds, of which Wells was supposed to receive three pounds for distribution.  *Id*.  Based on the

21

totality of the circumstances, there was certainly a fair probability that contraband or evidence of a crime would be found inside the duffel bag.  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

The same holds true for Nelson's residence. Officers obtained a search warrant for Nelson's residence after finding 5.28 kilograms of methamphetamine and 333.57 grams of heroin in the black duffel bag the day before, and after receiving information from Wells describing his and Nelson's drug-trafficking activities over the prior years.  Tr. at 333-35.  Again, there was more than a fair probability that evidence of narcotics trafficking would be found at Nelson's residence.

Nonetheless, even if either search warrant was found to be invalid or deficient in some respect, the officers acted in good-faith reliance on their validity.  In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court created a "good faith" exception to the exclusionary rule.  Evidence seized pursuant to a warrant that is later determined to be invalid will not be suppressed, provided the officers executing the warrant acted in good-faith reliance on its validity.  "The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Clay*, 646 F.3d 1124, 1127 (8th Cir. 2011) (alteration in original) (citation omitted); *see also United States v. Kattaria*, 553 F.3d 1171, 1179 (8th Cir. 20190) (noting that even if Court were to hold search warrant affidavit failed to establish probable cause, suppression of evidence would not be appropriate where defendant had not shown officers acted unreasonably in carrying out the search).

22

### 3. Failure to challenge witness credibility

Nelson does not identify what witness or witnesses to whom he is referring for his claim that counsel was ineffective for failing to attack "government witness credibility." However, in his appeal, Nelson raised a credibility challenge against Gino Wells's testimony and the testimony of Wells's son. Assuming the same offenders are targeted here, the Eighth Circuit reasoned, "Nelson argues that the testimony from Wells Sr. and his son was self-serving, and therefore could not allow a reasonable jury to find him guilty. However, '[w]hether a witness will receive a sentence reduction in exchange for this testimony[] is relevant to assessing the witness's credibility.'" *Nelson*, 51 F.4th at 818 (quoting *United States v. Espino*, 317 F.3d 788, 794 (8th Cir. 2003)).

Nelson's counsel indisputably attacked Wells's credibility during cross-examination, extensively belaboring the promise of a sentence reduction and even speculating that Wells was pinning the duffel bag on Nelson to protect his own son's involvement. Tr. at 397-409.

Beginning with an unrelated felony arrest, that was never charged in exchange for cooperation, Nelson's counsel questioned Wells:

> Q: [Y]ou cooperated and did proactive controlled buys for [TFO] Scott Johnston; is that correct?
> A: Correct.
> Q: Through that cooperation your felony charges were dismissed that time; is that right?
> A: Correct.

Tr. at 399-400.

> Q: Why were you in that meeting with the Government? What were you trying to get out of it?

23

A:      Hoping for a reduction in my sentence.
Q:      The same thing you're here for today?
A:      Correct.
. . .
Q:      And you're aware that you face in Counts 1 and 2 a mandatory minimum of 10 years up to life is your range of punishment; is that right?
A:      Yes.

Tr. at 402.

Q:      So the last time you cooperated you avoided any legal responsibility for it: Would that be fair to say?
A:      Correct.
Q:      And certainly you would be hoping for as close to that this time as possible; isn't that right?
A:      No, I wouldn't expect that.
Q:      Would it be fair to say that you want to go home as soon as possible?
A:      Anybody in jail does.

Tr. at 403.

Q:      Now, do you have an understanding of how you might receive time off of your sentence for your cooperation here today?
A:      I was told there might be a reduction in my sentence.
Q:      Did they speak specifically about a 5K motion?
A:      My lawyer had mentioned a 5K.  He said that it enables the Judge to go below a mandatory.

Tr. at 407.

Q:      And you're hoping for the best sentence possible; is that right?
A:      Correct.
Q:      And you're trying to get home to see your children as soon as possible?
A:      Yes, sir.
Q:      Because you love your children dearly; correct?
A:      Yes, sir.
Q:      And cooperating working with the Government is how you see the best path forward to getting home as soon as possible: Is that fair to say?
A:      Possibly.
Q:      Yes? Is that a yes?
A:      It's possibly. I haven't been promised a reduction.  I was told I may get a reduction, so it's possibly a way home, but it's not a guaranteed way home.
Q:      And you know you wouldn't get a reduction if you didn't cooperate;

24

> correct?
>
> A:    No.
>
> Q:    Your only path to a reduction in your sentence is through you cooperation and testimony here today; is that right?
>
> A:    Correct.

Tr. at 408.

Counsel also alluded to Wells cooperating to protect his own son from getting in trouble, the following exchange took place:

> Q:    And certainly you did not want to see Gino, Junior, get in trouble the night you were arrested at your house; correct?
>
> A:    What would he get in trouble for, sir?
>
> Q:    You wouldn't want to see him get in trouble?
>
> A:    He hadn't done anything.
>
> Q:    You wouldn't want to see him get in trouble; is that fair to say?
>
> A:    I don't see my son has done anything to get in trouble, sir. I'm not understanding your question. No parent wants to see their children in trouble, but my son did nothing wrong to get in trouble, so I don't understand what you're saying.
>
> Q:    The question was very simple, and you kind of answered it a little bit there, but the question simply was you didn't want to see Gino, Junior, get in trouble at your house the night of March 19th, 2019; is that correct? Yes?
>
> A:    I'm not sure how you want me to answer that.
>
> Q:    You didn't want to see him get arrested?
>
> A:    I have answered it as honestly as I can. My son had no reason to get in trouble.
>
> Q:    You did not want to see him get arrested that night; correct?
>
> A:    For what?
>
> Q:    Please answer the question. It's a very simple question.
>
> A:    I'm trying to answer it, sir. I'm not sure how you're wanting me to answer it. I'm answering it as honestly as I can. I don't see why my son would have been arrested. He was a 16-year-old kid.
>
> Q:    Yes or no you did not want to see your son get arrested March 19th, 2019?
>
> A:    No.

Tr. at 406-07.

Additionally, counsel primarily focused his entire closing argument on attacking Wells's credibility. Tr. at 502-11. Vehemently asserting that Wells's testimony was

25

"bought and paid for" by the government, Wells Sr. was portrayed as a "professional snitch" who simply could not be believed: "I told you during opening statements that this case would be mostly about Gino Wells and his testimony and his credibility." Tr. at 503-04. Counsel pleaded to the jury that the government had "better bring more than Gino Wells and a bunch of jumbled jail calls" if it expected them to convict Nelson of the charges. Tr. at 508. Counsel also attacked Wells's son's testimony, speculating that the 16-year-old was responsible for throwing the duffle bag out the window, despite there being no evidence to support the allegation. Tr. at 506-07.

At the end of the day, "the jury was entitled to make credibility determinations and reject [Nelson's] theory of the case." *United States v. Chelabarge*, 770 F.3d 714, 717 (8th Cir. 2014). The jury did so in this matter but not because of any failure on defense counsel's part.

### 4. *Failure to suppress evidence to allow a Brady violation*

Nelson's claim here is presumably challenging counsel's failure to suppress the single text message, "He's sending 30," that was the subject of his appeal. Claims raised and resolved on direct appeal should be deemed unreviewable in a § 2255 motion. *United States v. Shabazz*, 657 F.2d 189, 190 (8th Cir. 1981); *Dall v. United States*, 957 F.2d 571, 572 (8th Cir. 1992) (per curiam); *Bear Stops v. United States*, 339 F.3d 777, 780 (8th Cir. 2003). The law of the case doctrine requires that the decisions by the Eighth Circuit, handed down on direct appeal, remain undisturbed in subsequent proceedings. *Baranski v. United States*, 515 F.3d 857, 861 (8th Cir. 2008).

Admittedly, in his appeal Nelson raised the issue strictly as a *Brady* violation and

26

not an ineffective assistance of counsel claim.  Regardless, the Eighth Circuit held there was no substantial prejudice to Nelson based on the admission of a single text message. Likewise, here Nelson cannot prove prejudice.

As an initial matter, the Eighth Circuit determined the material was not *Brady* material at all due to its incriminating nature.  *Nelson*, 51 F.4th at 818.  In footnote 4 of the opinion, the Eighth Circuit noted, "[t]he parties agree that *Brady* is inapposite because the text message at issue is in no way exculpatory."  Importantly, to prove a *Brady* violation, "the defendant must show that *the evidence was favorable and material*" to the accused.  *United States v. Anwar*, 880 F.3d 958, 969 (8th Cir. 2018) (emphasis in original) (citation omitted).

Since the text message was incriminating to Nelson, the Eighth Circuit examined it under Rule 16 of the Federal Rules of Criminal Procedure, requiring the government to disclose any relevant written or recorded statement made by the defendant and noted the government conceded at oral argument that the text should have been disclosed prior to trial.  *Nelson*, 51 F.4th at 818-19.  Determining the district court did not abuse its discretion in admitting the text message, the Eighth Circuit found Nelson was not substantially prejudiced by introduction of the single innocuous text message, and parroted defense counsel's closing argument, "th[e] text message . . . doesn't say anything.  It doesn't corroborate anything. It doesn't say pounds. It doesn't say anything."  *Id*. at 819 (alteration in original).

The Court reasoned, "not every discovery violation requires exclusion of evidence. 'A district court does not abuse its discretion in allowing the introduction of evidence

27

disclosed in a dilatory fashion unless that evidence substantially prejudiced the defendant.'" *Nelson*, 51 F.4th at 819 (quoting *United States v. Beck*, 557 F.3d 619, 622 (8th Cir. 2009) (citation omitted).

Additionally, here counsel objected to admission of the text message. That the district court allowed its admission over his objection does not make counsel ineffective. Further, Nelson suffered no prejudice. To prevail on a § 2255 motion, a petitioner must demonstrate "a reasonable probability that, but for [counsel's acts or omissions], the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Williams v. Taylor*, 529 U.S. 362, 391 (2000) (defining "reasonable probability [as] a probability sufficient to undermine confidence in the outcome"). If the evidence of a petitioner's guilt is overwhelming, he cannot possibly establish prejudice, even if counsel's performance was deficient. *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001).

As to the deficiency prong, the petitioner must show that counsel "failed to exercise the customary skills and diligence that a reasonably competent attorney would [have] exhibit[ed] under similar circumstances." *Cheek v. United States*, 858 F.2d 1330, 1336 (8th Cir. 1988) (quoting *Hayes v. Lockhart*, 766 F.2d 1247, 1251 (8th Cir. 1985)) (alteration in original). As to the prejudice prong, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Cheek*, 858 F.2d at 1336 (quoting *Strickland*, 466 U.S. at 694).

"A reasonable probability is a probability sufficient to undermine confidence in

28

the outcome." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Strickland*, 466 U.S. at 694). "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen*, 563 U.S. at 189 (quoting *Harrington v. Richter*, 562 U.S. 86, 112 (2011)).

Finding Nelson was not substantially prejudiced by introduction of the text message, the Eighth Circuit resolved, "there was substantial evidence aside from the text to otherwise prove Nelson's guilt." *Nelson*, 51 F.4th at 819. The reference to a single cryptic text message stating "He's sending 30," could not have plausibly affected the outcome of the trial. The government presented ten witnesses and introduced 47 exhibits during the two-day trial. The evidence against Nelson was strong. The jury found the testimony of Gino Wells and his son to be credible. The Wellses' testimony was corroborated by law enforcement testimony and the physical evidence introduced. The jury also considered the events from the December 10, 2018, traffic stop, where Nelson attempted to flee the scene, and law enforcement officers found a half pound of methamphetamine and a firearm in his vehicle. The jury even heard recorded jail calls where Nelson attempted to have others take the charges for him. Tr. at 117-35, 169-92. In addition, the jury heard 404(b) evidence of Nelson's prior drug sale conviction from 2007. Overall, there was overwhelming evidence supporting Nelson's guilt. Nelson's claim here fails on its merits, as there was no *Brady* violation. It also fails for lack of deficient performance, as counsel objected to admission of the text message. Finally, it fails for lack of prejudice, as the single text message was not outcome determinative. Nelson is entitled to no relief for ground three of his § 2255 motion.

29

**D. Counsel was not ineffective for failing to raise objections to his sentence and to a firearm enhancement.**

Nelson was sentenced to a term of 300 months incarceration in the Federal Bureau of Prisons. This sentence was a downward variance from Nelson's sentencing guideline range of 360 months to life. PSR ¶ 98. Nelson asked for a sentence of 218 months. Doc. 179. Defense counsel raised several objections to the PSR that were overruled at sentencing. Doc. 193 ("Sent. Tr."). Namely, objections were raised to the following: Nelson's determination as a career offender (Paragraph 30); the Offense Conduct section (Paragraphs 7-18) as Nelson maintained his innocence; the amount of methamphetamine involved in the conspiracy (Paragraph 24); and a four-level enhancement for Nelson's classification as a leader or organizer (Paragraph 27). Sent. Tr. 2-7. Objections were not raised as to the sentence itself or to a two-level enhancement for possessing a firearm during the commission of the offense pursuant to USSG § 2D1.1(b)(1). Nelson now claims counsel was ineffective for failing to raise these additional objections. Nelson's claim is without merit.

As to the sentence itself, Nelson claims ineffectiveness for failing to object to its legality. Nelson does not suggest how or why he believes his 300-month sentence is illegal and only contests the two-point enhancement for the firearm. To adequately address this claim, the Court will assume the two-level enhancement is its source. Lending support, Nelson notes "the drugs [were] not in [his] home or property and the firearm was not part of the charged offense." Doc. 1. Nelson appears to be arguing since there was no firearm located inside the duffel bag with the methamphetamine and heroin,

30

it was not part of the "charged offense" and should not be counted for enhancement purposes.

Nelson fails to consider that even absent this two-level enhancement, his guideline imprisonment range remains the same.  Nelson was determined to be a Total Offense Level 42 and a Criminal History Category VI, resulting in a guideline imprisonment range of 360 months to life.  PSR ¶ 98.  If the two-level enhancement were removed, Nelson would be a Total Offense Level 40 and a Criminal History Category VI, resulting in a guideline imprisonment range of 360 months to life.  U.S.S.G. Chp. 5, Pt. A. Counsel was not ineffective for failing to object to an enhancement Nelson suffered no prejudice over.  Additionally, this Court showed Nelson lenient treatment and sentenced him to a downward variance of 300 months.

Even if the two-level firearm enhancement would have affected his sentencing guideline range; however, it would have survived an objection.  The commentary for U.S.S.G § 2D1.1(b)(1) states: "The enhancement for weapon possession in subsection (b)(1) reflects the increased danger of violence when drug traffickers possess weapons. The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense.  For example, the enhancement would not be applied if the defendant, arrested at the defendant's residence, had an unloaded hunting rifle in a closet."

Nelson's PSR mentioned two firearms in the Offense Conduct Section.  Doc. 178. Paragraph 12 stated the following:

As to the relevant conduct of Marcus Nelson, Nelson organized and/or led a

31

conspiracy with the co-defendants to distribute over 500 grams or of methamphetamine in the southeast Missouri area. On December 10, 2018, deputies with the Dunklin County, Missouri Sheriff's Office initiated a traffic stop on a dark colored 2000 GMC Denali for a lane violation in Kennett, Missouri. Two subjects fled from the vehicle. The suspects, later identified as Marcus Nelson and Darius Thomas, were apprehended. Investigators noticed a strong odor of marijuana coming from the vehicle. A search of the vehicle located a black bag containing approximately 235 grams of methamphetamine; a baggie containing 90 grams of marijuana; a German Sports, Model: GSG-Five PK, .22 caliber pistol; two loaded magazines with an unknown quantity of ammunition; various gun parts; and $103 in one dollar Federal Reserve Notes. Nelson was found in possession of $1,040 in United States currency and a Samsung cellular phone.

PSR ¶ 12.

Likewise, Paragraph 15 stated the following:

Further investigation determined Nelson was the head of a larger group of individuals distributing methamphetamine on his behalf including but not limited to Gino Wells, James Hamilton (unindicted in the Eastern District of Missouri), Matthew Stout, and others including subjects identified as Missy Cooksay (unindicted in the Eastern District of Missouri) and Mike Sheron (unindicted in the Eastern District of Missouri). Nelson received methamphetamine from his Dallas, Texas connections and then distributed quantities to the aforementioned subjects. Investigation also determined Nelson was distributing heroin and commonly carried firearms in relation to his drug distribution, including a Taurus, Model: 709 Slim, nine-millimeter caliber pistol located within the residence of one of Nelson's drug distribution conspiracy associates, James Hamilton, during a search conducted by law enforcement on March 20, 2019.

PSR ¶ 15.

As Nelson was convicted in Count I of Conspiracy to Distribute 500 Grams or More of Methamphetamine for events "[b]eginning at a time unknown to the Grand Jury but including on or about March 19, 2019," his relevant conduct of possessing firearms and narcotics detailed above clearly warrant the two-level enhancement. No argument exists that it was "clearly improbable" the aforementioned pistols were not connected to

32

the drug conspiracy.  In fact, the December 10, 2018, traffic stop revealed a firearm and two loaded magazines along with 235 grams of methamphetamine and 90 grams of marijuana, just three months prior to the March 19, 2019 seizure of 5.28 kilograms of methamphetamine and 333.57 grams of heroin.  The same holds true of the Taurus 9mm pistol that Nelson was known to carry, that was seized the following day from a co-conspirator's residence.  Regardless, since the two-level enhancement did not affect the sentencing guideline range, there was no prejudice to warrant relief.  Nelson is entitled to no relief for ground four of his § 2255 motion.

### IV.  CONCLUSION

For the foregoing reasons, this Court will deny Petitioner's § 2255 motion [Doc. 1] without an evidentiary hearing.

**IT IS FURTHER ORDERED** that this Court will not issue a certificate of appealability because Petitioner has not made a substantial showing of the denial of federal constitutional right.

**SO ORDERED** this 13th day of March, 2026.

_____
STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE

33